1997-NMSC-043

945 P.2d 992

**LEXINGTON INSURANCE COMPANY, Cross–Plaintiff and Third–Party Plaintiff–Appellant,**

v.

**Kenneth RUMMEL, International Surplus Lines Insurance Company, et al., Cross–Defendants and Third–Party Defendants–Appellees.**

No. 23435.

Supreme Court of New Mexico.

Aug. 8, 1997.

Certiorari Denied Sept. 15, 1997.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Mark C. Meiering, Albuquerque, for Appellant.

Randi McGinn & Associates, P.A., Randi McGinn, William B. Towle, Albuquerque, for Appellees.

## OPINION

BACA, Justice.

1. This is an appeal from a district court order granting International Surplus Lines Insurance Company's (ISLIC) motion for summary judgment on Lexington Insurance Company's (Lexington) claim of prima facie tort. Lexington's allegation of prima facie tort arose out of ISLIC's entry into a settlement agreement in a personal injury case. According to Lexington, the settlement agreement was designed to injure Lexington by shifting partial liability for a judgment, which ISLIC and other insurers should have paid, onto Lexington. The district court granted ISLIC's motion for summary judgment because Lexington failed to present evidence supporting each element of prima facie tort. Lexington appealed that order. The Court of Appeals certified the case to this Court pursuant to NMSA 1978, § 34–5–14(C) (1972), because the appeal raised questions of substantial public interest concerning the elements of prima facie tort. We hold that the district court correctly determined that Lexington failed to raise material issues of fact as to whether ISLIC committed a prima facie tort and we affirm the order granting ISLIC summary judgment.

## I.

2. Kenneth Rummel was injured during a robbery at the Circle K store where he was employed. Rummel sued Circle K, alleging that his injuries arose out of the negligence and outrageous conduct of Circle K, and obtained a judgment against Circle K for $1,042,844.28 in compensatory damages and $10,700,000 in punitive damages. Circle K maintained numerous insurance policies that should have been sufficient to cover this judgment. The following table and narrative are provided to clarify how the various insurance policies purchased by Circle K relate to one another.

| Circle K | $ 250,000 (self-insured retention) |
| Columbia | $ 750,000 (primary insurance) |
| ISLIC | $ 5,000,000 (excess insurance) |
| Lexington | $10,000,000 (excess insurance) |

3. Circle K held a self-insured retention under which is assumed the risk of the first $250,000 of liability. A Columbia Casualty Company (Columbia) policy indemnified Circle K for damages in excess of $250,000 but not exceeding $1,000,000. Circle K had a comprehensive catastrophic liability insurance policy from ISLIC which applied to damages over $1,000,000 and provided $5,000,000 in coverage. Circle K also had a policy issued by Lexington providing $10,000,000 in coverage and expressly excluding coverage of punitive-damage liability. Lexington's policy contained a condition precedent to coverage, requiring that the total limits of all the underlying coverage be paid before Lexington's obligation to pay would arise.

4. Following entry of the judgment against Circle K, ISLIC offered to defend Circle K's appeal, only later deciding to enter into a settlement agreement with Rummel. The settlement agreement allowed ISLIC to receive full credit for payment of its policy limits without actually paying Rummel the entire $5,000,000 of coverage. Circle K was undergoing bankruptcy reorganization and the settlement agreement allowed Circle K to meet its $250,000 self-insurance obligation by

granting Rummel a $500,000 unsecured claim in the reorganization. The settlement agreement also provided that ISLIC would pay Rummel $1.625 million against the punitive damages award and reimburse Circle K for two thirds of the workers' compensation benefits paid by Circle K to Rummel. Circle K agreed to release any further claims it may have had against ISLIC and assigned Rummel all of its causes of action and rights against the insurance companies that had not participated in the settlement agreement.

5. ISLIC was the only insurance company that acknowledged liability for the judgment against Circle K. Therefore, Rummel, both individually and as the assignee of Circle K and ISLIC, filed a complaint against the other insurance companies, including Lexington. Lexington has refused to provide coverage for the judgment, raising multiple defenses including: (1) the compensatory judgment did not reach the threshold level necessary to invoke coverage under the Lexington policy; (2) the underlying insurance companies have failed to pay their full policy limits.

6. In response to Rummel's complaint, Lexington filed a counter-claim and third-party complaint, alleging that ISLIC, Circle K, Rummel, and Rummel's attorney had committed prima facie tort by entering into the settlement agreement.[1] Lexington claimed that the settlement agreement was designed to shift partial responsibility for the judgment onto Lexington. According to Lexington, the shift in responsibility was accomplished in part through assignment of ISLIC's coverage to the punitive damages award, leaving the compensatory damage award unpaid. Because the total punitive damage award was $10,700,000, all of Circle K's, Columbia's, and ISLIC's coverage, amounting to $6,000,000, could be assigned to the punitive damages award without satisfying that portion of the judgment. More importantly, by assigning this coverage to the punitive damages award, the compensatory damage award remained unpaid after the policies underlying Lexington's were exhausted. The end result is that Lexington

may have to provide coverage for the punitive damage award.

7. In its counter-claim, Lexington alleged that ISLIC and Circle K had committed prima facie tort by entering into a secret settlement agreement with Rummel "in order to protect their own interest at the expense of Lexington." Lexington alleged that the act of entering into the settlement agreement was "done all for the purpose of forcing Lexington through financial duress and coercion to pay Rummel and [his attorney] additional sums of money on the Judgment even though all parties knew about but were deliberately indifferent to the terms of Lexington's excess insurance policy which on the facts and on the face of the policy did not impose any liability on Lexington for payment of the ... Judgment."

8. In response to Lexington's counter-claim ISLIC filed a motion for summary judgment, arguing that Lexington had not alleged facts sufficient to satisfy all the elements of prima facie tort. In particular, according to ISLIC, there were no facts supporting the necessary prima facie tort element of intent to injure. The district court agreed and entered an order granting ISLIC's motion for summary judgment. Lexington appeals that order.

## II.

9. On appeal, we address whether the district court erred in granting summary judgment based on its finding that Lexington failed to allege facts sufficient to establish all of the elements of prima facie tort. Summary judgment is proper where there are no genuine issues as to material facts, entitling the movant to judgment as a matter of law. *See* Rule 1–056(C) NMRA 1997; *Fleet Mortgage Corp. v. Schuster,* 112 N.M. 48, 49, 811 P.2d 81, 82 (1991). The movant must make a prima facie showing of entitlement to summary judgment, shifting the burden to the opponent to show a reasonable doubt as to whether a genuine issue for trial exists. *See Fleet,* 112 N.M. at 50, 811 P.2d at 83. We hold that the district court properly granted this motion for summary judgment.

---

1. Lexington eventually dismissed its third-party complaint against Rummel's attorney.

10. New Mexico officially recognized a cause of action for prima facie tort in *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990). Prima facie tort occurs when a lawful act is conducted with an intent to injure and without sufficient economic or social justification, resulting in injury. *See id.* at 390, 785 P.2d at 730. The generally recognized elements of prima facie tort adopted by this Court in *Schmitz* are: (1) an intentional and lawful act; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; (4) and the absence of sufficient justification for the injurious act. *Id.* at 394, 785 P.2d at 734. The terms malice and intent to injure have been used synonymously within our jurisprudence on prima facie tort. *See, e.g., id.* at 395, 785 P.2d at 735 (utilizing malice and intent to injure interchangeably in discussing prima facie tort).

11. In recognizing prima facie tort, this Court emphasized the importance of limiting the cause of action. *See id.* at 398, 785 P.2d at 738. Prima facie tort was not intended to provide a remedy for every intentionally caused harm. *Id.* at 394, 785 P.2d at 734. Rather, the cause of action provides a remedy for acts committed with an intent to injure the plaintiff and without justification. *Id.* at 395, 785 P.2d at 735. Therefore, balancing the malicious intent of the defendant against both the justifications for the injurious act offered by the defendant and the severity of the injury is a necessary step in assessing whether a prima facie tort has been committed. *Id.* at 394–95, 785 P.2d at 734–35. Where there is no evidence of intent to injure, there is no need to proceed with the balancing test.

12. We therefore focus on whether Lexington produced evidence of ISLIC's intent to injure Lexington which would necessitate application of the balancing test. Plaintiffs bear a heavy burden to establish intent to injure. *See, e.g., Boatmen's Bank of Butler v. Berwald*, 752 S.W.2d 829, 833 (Mo.Ct.App.1988) (there is "a heavy burden of proving 'actual intent' of [the defendant] to injure...."); *Riley v. Riley*, 847 S.W.2d 86, 89 (Mo.Ct.App.1992) ("The intent to cause injury carries a heavy burden of proof.").

13. As in *Schmitz*, we find Missouri case law instructive in defining the type of proof necessary to support the prima facie tort element of intent to injure. For example, in *Kiphart v. Community Federal Savings & Loan Association*, 729 S.W.2d 510 (Mo.Ct. App.1987), a bank was accused of prima facie tort for interrogating a teller in order to determine whether the teller was responsible for a cash shortfall. The court reversed a judgment in favor of the teller's prima facie tort claim, holding that the bank had acted to protect its economic interest, a conclusion resulting from the absence of evidence of the bank's intent to harm the teller. *See id.* at 517. In *Centerre Bank of Kansas City v. Distributors, Inc.*, 705 S.W.2d 42, 53 (Mo.Ct. App.1985), evidence was presented at trial that a bank called in a note knowing that a corporation would go out of business as a result. The Missouri appellate court expressed doubt as to the sufficiency of the evidence that the bank acted out of personal animus toward the corporation's owner. *See id.* at 54. The court concluded that the plaintiff had failed to establish the element of intent to injure, noting instead that the bank was acting to protect a valid business interest. *Id.* at 53–54 (finding business interests relevant to the issue of intent to injure).

14. Intent to injure is distinct from intent to commit the act which results in injury. *See Schmitz*, 109 N.M. at 397–98, 785 P.2d at 737–38; *see also Boatman's*, 752 S.W.2d at 833 ("[P]roof on the element of intent to injure must be of an 'actual intention' to injure, not merely an intent to do the act which may result in the claimed injury."). The plaintiff must produce more than a showing that injury is a natural and foreseeable consequence of the act. *See Schmitz*, 109 N.M. at 398, 785 P.2d at 738 (discussing evidence of intent to injure beyond mere intent to commit the act that caused the harm). Additionally, the plaintiff must demonstrate more than mere insensitivity towards the injured party. *See Boatman's*, 752 S.W.2d at 833–34. After all, "[t]o allow such a lax standard would be to invite every victim of an intentional act to bring an action in prima facie tort and would subvert the purpose of prima facie tort by eliminating the

element requiring that a defendant intended injury to the plaintiff." *Schmitz,* 109 N.M. at 398, 785 P.2d at 738.

15. In its Motion for Summary Judgment, ISLIC asserted that Lexington had failed to establish sufficient evidence of the prima facie tort element of intent to injure. Specifically, Lexington failed to establish that ISLIC's act of entering into the settlement agreement was committed to injure Lexington, an element needed to rebut ISLIC's Motion for Summary Judgment. Instead, Lexington's allegations show that ISLIC was motivated by a desire to protect both itself and its insured from liability for Rummel's judgment. Lexington alleged that "ISLIC chose to protect its own pocketbook to the tune of $3,300,000 by undermining Lexington's policy, fostering Rummel's litigation against Lexington;" and that ISLIC entered into the settlement agreement because "it was a financially good deal for ISLIC to help Rummel target Lexington in order to get Rummel off ISLIC's back." Additionally, Lexington alleged that "[w]ithout notice to Lexington, they entered into pleadings which led to bankruptcy orders in Circle K's bankruptcy proceedings in Arizona to gain concessions for Circle K Corporation and to gain certain benefits for International Surplus Lines [and Rummel], for the purpose of shifting the burden of the Judgment ... to Lexington." These factual allegations indicate that ISLIC was motivated by the legitimate business purpose of reducing its own liability and the liability of its insured in the face of an enormous judgment, rather than by an intent to injure Lexington.

16. ISLIC intended to reduce its liability for the judgment. ISLIC was obviously aware that the settlement agreement could shift liability for the judgment onto Lexington. ISLIC certainly displayed insensitivity towards the potential injury to Lexington which was the natural and foreseeable result of the settlement agreement. Yet, the record is devoid of evidence of ISLIC's malicious intent to injure Lexington. Thus, there was no need for a trier of fact to balance the intent to injure against the justifications for the injurious act. Lexington has failed to produce evidence sufficient to raise a material question as to whether ISLIC intended to injure Lexington.

17. Having failed to provide any evidence to support the intent element of prima facie tort. Lexington has not rebutted ISLIC's prima facie showing of entitlement to summary judgment. The district court properly disposed of Lexington's prima facie tort claim by granting ISLIC's motion for summary judgment. We find no merit in Lexington's other arguments and affirm the court below.

18. **IT IS SO ORDERED.**

FRANCHINI, C.J., and McKINNON, J., concur.

